## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SERIES 17-04-631, LLC, a series of
MSP RECOVERY CLAIMS, SERIES LLC,

      Plaintiff,

v.

MCKINSEY & COMPANY, INC. and
MCKINSEY & COMPANY, INC., UNITED
STATES,

      Defendants.

_____/

Civil Action No:

**CLASS ACTION COMPLAINT
DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff Series 17-04-631, LLC, a series of MSP Recovery Claims, Series LLC ("Series 17-04-631"), on behalf of itself and others similarly situated (the "Class Members"), brings this action against McKinsey & Company, Inc. and McKinsey & Company, Inc. United States (collectively, "McKinsey"), regarding its pivotal role in orchestrating a conspiracy to proliferate the worst drug epidemic in this country's history. In support thereof, Plaintiff states as follows:

## INTRODUCTION

1.    The opioid drug epidemic has claimed hundreds of thousands of victims throughout the United States. Over prescription of opioids continues to ravage the lives of many, contributing to one of the largest public health epidemics in the country's history. This epidemic, engineered by McKinsey and its opioid manufacturer co-conspirators, has resulted in grim economic consequences—forcing private and government-funded health plans, including Plaintiff's Assignor, to foot the bill for both unnecessary opioid prescriptions and the inevitable expenses relating to the treatment of opioid addiction.

2.    This action seeks relief under the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961, *et seq*., state consumer protection statutes, and common law, arising from the lucrative fraudulent scheme contrived and implemented by McKinsey and its opioid manufacturer co-conspirators to cause healthcare providers in the U.S. to over prescribe opioid drugs to an unsuspecting public.

3.     McKinsey is a multinational consulting firm. Despite the widely publicized opioid epidemic sweeping the United States, and the injuries and deaths associated therewith, McKinsey conspired with opioid manufacturers to increase the distribution of the highly addictive drugs— with no apparent regard for the consequences, societal or otherwise.

4.     McKinsey's brainchild was called the Evolve to Excellence initiative, or "E2E." In their own words, E2E "turbocharged" opioid sales. E2E strategies included aggressive marketing aimed at high volume prescribers, lucrative dosing adjustments, and implementing strategies to ensure that written prescriptions were filled. E2E marketing efforts involved dosage increases, initiating opioid treatment for naïve patients, and converting patients from immediate release opioids to extended-release formulations.

5.     McKinsey's aggressive strategy worked. Opioid use and addiction skyrocketed. In their quest for exponential profit growth for themselves and their clients, McKinsey demonstrated a reckless disregard for the injuries it and its co-conspirators were causing. As a result of the opioid epidemic, an estimated 450,000 people have died of opioid related overdoses.

6.     Individuals are not the only victims of McKinsey and their co-conspirators' conduct. Plaintiff's Assignor and the putative Class Members have, and continue to, absorb costs for over-prescribed opioid drugs as well as inpatient and outpatient treatment of opioid addicted patients. The estimated economic burden for prescription opioid misuse in the United States is

$78.5 billion annually.[1]  Plaintiff's Assignor and the putative Class Members have suffered a large portion of this economic damage.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). At least one member of the putative class is a citizen of a different state than McKinsey, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §1961, *et seq.* and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over McKinsey under the Constitution of the United States because it conducts business in the Commonwealth of Massachusetts, purposely directs or directed its actions toward the Commonwealth of Massachusetts, and/or has the requisite minimum contacts with the Commonwealth of Massachusetts necessary to permit the Court to exercise jurisdiction. This Court also has personal jurisdiction over McKinsey because Plaintiff's claims arise out of, or relate to, McKinsey's contacts with the Commonwealth of Massachusetts.

10.     At all times relevant hereto, McKinsey engaged in the business of researching, designing, and implementing marketing and promotional strategies for various opioid manufacturers that were intended to be, and were, implemented in, or which implementation had a substantial and intended effect in the Commonwealth of Massachusetts, among other places.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because McKinsey transacts business in, is found in, and/or has agents in the Commonwealth of Massachusetts, and because some of the actions giving rise to this Complaint took place in this

---

[1] *Opioid Overdose Crisis*, Nat'l Inst. on Drug Abuse (last updated Mar. 11, 2021),
https://www.drugabuse.gov/drug-topics/opioids/opioid-overdose-crisis (last accessed Mar. 30, 2021).

district.

12.     Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because McKinsey resides in, is found, has an agent, or transacts its affairs in this District.

**PARTIES**

**I.      Plaintiff**

13.     Plaintiff Series 17-04-631 is a designated series of MSP Recovery Claims, Series LLC with its principal place of business in Coral Gables, Florida.

14.     MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company whose limited liability agreement provides for the establishment of one or more designated Series. MSPRC has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other Company assets, and in order to account for and associate certain assets with certain particular series.

15.     Series 17-04-631 obtained an assignment from Fallon Community Health Plan, Inc. ("Plaintiff's Assignor" or "Fallon"). Fallon is a Massachusetts corporation with its principal place of business in Worcester, Massachusetts.

**II.     Defendants**

16.     Defendant McKinsey & Company, Inc. is a New York corporation with its principal place of business located in New York, New York.

17.     Defendant McKinsey & Company, Inc., United States is a Delaware corporation with its principal place of business in New York, New York. McKinsey & Company, Inc., United States is registered to do business in the Commonwealth of Massachusetts.

18.     McKinsey & Company, Inc. and McKinsey & Company, Inc., United States are collectively referred to as "McKinsey." McKinsey is a management consulting firm with over 30,000 employees and operates in more than 65 countries. McKinsey has an office located at 280

4

Congress Street, Suite 1100, Boston, Massachusetts, and it regularly transacts business within the Commonwealth of Massachusetts.

## STANDING

19.     Plaintiff is an assignee of legal rights of recovery and reimbursement for health care services from Fallon. Fallon made payments on behalf of, or otherwise became financially responsible for, its enrollees' medical expenses, some of which have been incurred as a result of McKinsey's illegal conduct.

20.     Plaintiff's assignments are valid and binding contracts.

21.     On June 19, 2017, Fallon Community Health, Inc. ("Fallon"), a Massachusetts corporation, irrevocably assigned all its rights and claims to recover against any liable entity (including McKinsey) for payments made on behalf of their Enrollees pursuant to Medicare law to MSP Recovery, LLC. Specifically, the Fallon Assignment states the following:

> [Fallon] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Fallon's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Fallon] that [Fallon] had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [Fallon] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims." The transfer, grant, right, or assignment of any and all of [Fallon's] right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

Fallon Assignment at 4.1.

22.     On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the Fallon Assignment to Series 17-04-631, LLC, a designated series of MSP Recovery Claims, Series LLC:

5

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [Fallon] and MSP Recovery, LLC . . .

Consideration was given between the parties in executing these agreements.

23.     At all material times hereto, Fallon provided benefits for its plan beneficiaries, including payment for its enrollees' opioid prescriptions and inpatient and outpatient treatment for opioid addiction. Consequently, Fallon has been economically injured by McKinsey's illegal conduct and Plaintiff maintains the right to recover against McKinsey for that economic loss.

## FACTUAL ALLEGATIONS

I.     **Background**

24.     Beginning in the mid-1990s, opioid manufacturers pursued aggressive sales strategies to increase sales of their prescription opioids, a plan that resulted in a dramatic rise in opioid prescriptions throughout the United States. The rise in opioid prescriptions caused an equally devastating rise in opioid abuse, dependence, addiction, and overdose deaths.

25.     Prescription opioids continue to kill thousands of people throughout the United States every year. Thousands more suffer from negative health consequences as a result of opioid use.

26.     McKinsey is one of the world's largest consulting companies. It provides consulting services worldwide for corporations and governments across diverse industries. McKinsey sells the notion that it can take whatever a company or government is doing and make them do it better.

27.     Despite the widely publicized opioid epidemic sweeping the United States, and the injuries and deaths associated therewith, McKinsey conspired with opioid manufacturers to

increase the distribution of the highly addictive drugs—with no apparent regard for the consequences, societal or otherwise.

28.     Plaintiff, on behalf of itself and the putative Class Members, brings this action against McKinsey for the consulting services it provided to opioid companies in connection with designing the companies' marketing plans and programs that helped cause and contribute to the opioid crisis. McKinsey sold its ideas to opioid drug manufacturers, including, but not limited to, Purdue Pharma, L.P. ("Purdue"), Johnson & Johnson ("J&J"), Endo International plc ("Endo") and Mallinckrodt Pharmaceuticals plc ("Mallinckrodt") (collectively, the "Opioid Manufacturers").

29.     On May 10, 2007, John L. Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P. ("Purdue"), relating to the misbranding of OxyContin. Brownlee stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal … In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.[2]

30.     Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States Department of Health and

---

[2] John L. Brownless, *The Purdue Frederick Company, Inc. and Top Executives Plead Guilty to Misbranding OxyContin; Will Pay over $600 Million*, U.S. Atty's Off. W.D. Va. (May 10, 2007), https://web.archive.org/web/20070512174719/http://www.usdoj.gov/usao/vaw/press_releases/purdue_fre derick_10may2007.html (last accessed Mar. 30, 2021).

Human Services ("HHS").[3] For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives *vis-à-vis* their interactions with health care providers.

31.     In the wake of Purdue's accession to the CIA, Purdue faced newly imposed constraints on its sales and marketing practices. Despite the CIA's constraints (*i.e.*, do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

32.     The problem was complex. As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded as an increasingly "dangerous concentration of risk" for Purdue's owners. One week after the guilty plea was announced, David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:



33.     Given concern over this "dangerous concentration of risk," the Sackler family spent

---

[3] Corporate Integrity Agreement ("CIA"), *United States v. Purdue Frederick Co.*, No. 1:17-cr-00029-JPJ (W.D. Va. May 10, 2007), Dkt. # 5-5 through 5-6.

considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. Shire plc was discussed as a possible target, as was Cephalon, Inc., UCB S.A., and Sepracor Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

34.     Another option was to have Purdue borrow money in order to ensure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

35.     In order to pursue *either* of these options, the Sacklers needed to maximize opioid sales *in the short term* so as to make Purdue—by then the subject of substantial public scrutiny—appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

36.     Given the complexity of the problem and the constraints of the CIA, the Sacklers and Purdue realized they would need outside assistance. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey[4], which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

37.     Despite knowing the dangers of opioids and of Purdue's prior misconduct,

---

[4] McKinsey has an international presence and has numerous corporate entities. On information and belief, the entities involved in the engagement with Purdue (and other Opioid Manufacturers) are McKinsey & Company, Inc., and McKinsey & Company, Inc., United States.

McKinsey agreed to work with Purdue. By June 2009, McKinsey and Purdue were working to maximize OxyContin sales. McKinsey devised a plan to work around the requirements of the CIA, suggesting a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey then worked intimately with Purdue on an ongoing basis to implement its plan. Despite the strictures imposed by the CIA, OxyContin sales began to multiply.

38.     In 2012, Purdue's CIA ended, and with its expiration McKinsey's ongoing relationship with Purdue flourished. In 2013, McKinsey proposed, and Purdue implemented with McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy to increase opioids sales by **hundreds of millions** of dollars annually. Purdue then picked a new name—*E2E: Evolve 2 Excellence*—and adopted it as the theme of its 2014 national sales meeting. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[5]

39.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the growth of opioid sales to benefit Purdue.[6] On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair—will continue. It

---

[5] On February 9, 2018, Purdue announced that it would no longer market opioids and disbanded its OxyContin sales force. Pharma L.P., *Purdue Pharma L.P. Issues Statement on Opioid Promotion* (Feb. 9, 2018), https://www.purduepharma.com/news/2018/02/09/purdue-pharma-l-p-issues-statement-on-opioid-promotion/ (last accessed Mar. 30, 2021).

[6] *See* Michael Forsythe & Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html (last accessed Mar. 30, 2021).

is the price we pay for being 'in the arena' and working on what matters."[7]

40.    Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated.[8]

41.    This complaint concerns McKinsey's work for the Opioid Manufacturers, beginning as early as 2004, and in particular McKinsey's work for Purdue in the years following the 2007 guilty plea relating to Purdue's sales and marketing strategy for its opioids.

## II.    Purdue Pleads Guilty to Misbranding OxyContin and Is Bound by a Corporate Integrity Agreement.

42.    On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301, *et seq*.

43.    Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[9]

44.    Concurrent with the guilty plea by the Purdue Frederick Company, Purdue entered into a CIA with the Office of Inspector General of HHS on May 7, 2007.[10]

---

[7] *See "The Price We Pay for Being, 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Mag. (Mar. 8, 2019, 9:30 AM), https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/ (last accessed Mar. 30, 2021).

[8] *See* Paul R. La Monica, *Consulting Firm McKinsey No Longer Working With Opioid Maker Purdue Pharma*, CNN Bus. (updated May 24, 2019, 2:33 PM), https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin (last accessed Mar. 30, 2021).

[9] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 1:07-cr-00029-JPJ (W.D. Va. May 10, 2007), Dkt. No. 5.

[10] CIA, *supra* note 3.

45.     Purdue's compliance obligations under the CIA ran for a period of five years, expiring on May 10, 2012.[11]

46.     Pursuant to the CIA, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin. Purdue was further obligated to implement written policies regarding its compliance program and its compliance with federal health care program and United States Food and Drug Administration ("FDA") requirements, including:

> selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate . . . including, but not limited to, information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;
>
> compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;
>
> …
>
> the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products. These Policies and Procedures shall address the following items: the form and content of Materials disseminated by sales representatives; and the internal review process for the Materials and information disseminated by sales representatives.[12]

47.     Purdue also was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the CIA, and to file compliance reports on an annual basis with the inspector general.[13]

---

[11] *Id.* at p.1.

[12] *Id.* at pp. 7, 8-9.

[13] *Id.* at pp. 14, 23.

**III.    Purdue Hired McKinsey to Boost Opioid Sales Despite the CIA**

48.    The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[14]

**A.    The Sacklers Distanced Themselves from Purdue.**

49.    After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was a "dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

50.    In the event that a purchaser for Purdue could not be found, Richard Sackler stated Purdue should "distribute more free cash flow" to the Sacklers. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin. In the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible:

---

[14] Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

$300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to the owners.[15]

51.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty plea, "several family members who worked at Purdue stepped back from their operational roles."[16] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They remained on the board of directors, however.

52.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. ("Rhodes"). The Sacklers established Rhodes *four months* after the 2007 guilty plea.[17] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[18]

---

[15] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall St. J. (updated June 30, 2019, 6:15 PM), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120 (last accessed Mar. 30, 2021)

[16] Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* at p. 167 (2018).

[17] *Billionaire Sackler Family Owns Second Opioid Maker*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132 (last accessed Mar. 30, 2021).

[18] *Id.*

B.     **Purdue Hired McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals.**

53.    The Sacklers faced a problem: either option they were pursing—a sale or significant distributions to shareholders—would require Purdue to increase profitability in the short term. This meant they needed to grow OxyContin sales as dramatically as possible while at the same time appearing to comply with the CIA.[19]

54.    Purdue and the Sacklers were well aware of the constraints posed by the CIA. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead "create a separate Sales Force for Intermezzo [a sleeping pill]—that would be comprised of approximately 300 representatives." Stewart, the Sacklers' chosen CEO, saw an opportunity, and asked if the CIA would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Stewart inquired whether the new drug launch might fall outside of the CIA.

55.    Bert Weinstein ("Weinstein"), Purdue's Vice President of Corporate Compliance, told Steward that the new drug launch would still be covered by the CIA.

56.    Given the tension between compliance with the CIA and the desire to sell more OxyContin, Purdue needed help.

---

[19] As one Purdue executive stated of Purdue's attitude toward the CIA: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change—the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c (last accessed Mar. 30, 2021).

57.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[20]

58.     Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the CIA internally, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales in light of the CIA and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

59.     In short, Purdue would pay money to McKinsey in exchange for McKinsey telling the company how to sell as much OxyContin as possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue.

60.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the CIA on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

61.     Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey.

62.     In addition, Weinstein, who was "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in th[e] CIA,"[21] reported directly to Stewart.

---

[20] *How McKinsey Became One of the Most Powerful Companies in the World*, YouTube (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII (last accessed Mar. 30, 2021).

[21] CIA, *supra* note 3 at p. 4.

63.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

64.     McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

65.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its *implementation*.

## IV.     Purdue Relied on McKinsey

66.     McKinsey is not hired to give casual advice. They are a corporate mandarin elite, likened to the Marines or the Jesuits.[22] United States Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of the Wall Street Journal that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "[s]o I would have . . . at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[23]

---

[22] Said one former McKinsey partner to Business Week in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." Duff McDonald, *The Firm: The Story of McKinsey and Its Secret Influence on American Business* at pp. 136-37 (2013) at p. 165.

[23] *Id.* at p. 1.

67.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

68.     McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

69.     At its core, the "transformational relationship" is **long-term**. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[24] The long term result can be "dependence" on the McKinsey consultants.

70.     This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, Business Week noted that at that moment, the firm had served four hundred clients for fifteen years or more.[25]

---

[24] *Id.* at p. 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian ("Gordian") wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here."* (emphasis added). Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

[25] *Id.* at p. 126.

71.     Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although it is known that McKinsey worked with Purdue for years before Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying CIA. The work continued through at least 2018.

72.     McKinsey partner Gordian, in her March 26, 2009 "EY2009 Impact Summary" internal memorandum to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee Manager Kristine Lavik, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of the firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

73.     McKinsey staffed at least thirty-six known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

## V.     McKinsey Developed a Granular Strategy for Purdue

74.     By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales despite the CIA and the diminishing outlook for Purdue.

75.     In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

**A.     Granular Growth.**

76.     McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

77.     After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

78.     In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the source of growth and exploiting them for all they are worth. In August 2008, McKinsey Director Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance*. "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[26]

---

[26]  Book Excerpt: *The Granularity of Growth*, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth (last accessed Mar. 30, 2021).

79.     In an article in the McKinsey Quarterly published the same month that Purdue pled guilty, the authors explained:

> Our research on the revenue growth of large companies suggest that executives should "de-average" their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[27]

80.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[28]

**B.     "Identifying Granular Growth Opportunities for OxyContin."**

81.     In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

82.     McKinsey performed this assignment in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "[d]eep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18% … Further, the Walgreens data also shows significant impact on higher OxyContin dosages." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of

---

[27]   Mehrdad Baghai et al., *The Granularity of Growth*, McKinsey Q. (May 1, 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth (Mar. 30, 2021).

[28]   *Id.*

opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens actions.

83.     The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### 1.     Marketing – Countering Emotional Messages

84.     From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss how best to "counter the emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

85.     Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

86.     These marketing claims were tailored to avoid any pitfalls that the CIA might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the CIA.[29]

87.     Purdue's marketing materials from that time period are illustrative of this approach.[30]

---

[29] CIA, *supra* note 3 p. 7.

[30] Julia Lurie, *Court Documents Show How OxyContin's Sales Team Pushed "Hope in a Bottle"*, Mother Jones (July 19, 2018), https://www.motherjones.com/politics/2018/07/court-documents-show-how-oxycontins-sales-team-pushed-hope-in-a-bottle/ (last accessed Mar. 30, 2021).



88.    In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment *patients* to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

###    2.    Targeting – Selling More OxyContin to Existing High Prescribers

89.    Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target them with ever more sales and marketing resources.

90.    On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

91.     Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

92.     Many of the historically highest prescribers of OxyContin—those same individuals that McKinsey urged Purdue to target—had prescribed Purdue's OxyContin ***before*** the 2007 guilty plea and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

93.     McKinsey identified these physicians—those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin.

94.     McKinsey worked closely with Purdue over many years to continually refine this approach and required increasingly granular data for its analysis. More than three years after the introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so it could further analyze the amounts of OxyContin prescribed by individual physicians.

95.     At the same time, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

96.     On July 23, 2013, Purdue's board of directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

97.     McKinsey told Purdue and the Sacklers that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged

Purdue and the Sacklers to "make[] a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

98.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

99.     By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

### 3.     Titration – Selling Higher Doses of OxyContin.

100.    McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

101.    Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

102.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

103.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### 4.    Covered Persons – Sales Quotas and Incentive Compensation

104.    McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

105.    Notably, this behavior was contemplated by the CIA, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives ***do not inappropriately motivate such individuals to engage in the*** improper promotion or sales of Purdue's products."[31]

106.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of annual sales visits that Purdue sales representatives were required to make to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 visits in 2012; and 744,000 visits in 2013.

107.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

108.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to

---

[31] CIA, *supra* note 3 at p. 7 (emphasis added).

the Purdue board of directors in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the focus of the sales force on top prescribers, to also increase the overall quotas for sales visits for each sales representative from 1,400 to up to 1,700 annually.

109.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):



110.    By eliminating one third of the time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of calls per day out of its newly less-trained sales force.

111.    Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the CIA.[32] McKinsey knew

---

[32] CIA, *supra* note 3 at p. 2.

that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

### 5. Increasing the Overall Size of the Opioid Market: The Larger the Pie, the Larger the Slice

112.    Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone."[33] Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to one's own. If, however, the goal is to position a company to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market[.]"[34]

113.    Notably, this notion that the size of a company's market share is not as important as the size of the *overall* market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth*, McKinsey stated, "[o]ne of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[35]

---

[33] Crow, *supra* note 19.

[34] *Id.*

[35] Book Excerpt, *supra* note 26.

114.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies." "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[36] McKinsey designed this plan.[37]

## VI.    The Transformation: McKinsey Worked with Purdue to Implement its Strategies

115.    As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

116.    Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

117.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on the "physician segmentation" initiative that McKinsey urged and developed as a result of its granular analysis of OxyContin sales channels. The initiative sought to

---

[36] Crow, *supra* note 19.

[37] It is worth noting that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their ownership of Rhodes. Especially worth noting is that this strategy also benefitted McKinsey's other opioid clients, such as J&J, Endo and Mallinckrodt. "They have a huge amount of inside information, which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, Institutional Inv. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written (last accessed Mar. 30, 2021). For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge ***of the ways other pharma companies operate*** suggests Purdue should reassess the roles of MSL and HECON Groups - and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

118.    On January 20, 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

119.    This collaboration would continue over the course of the relationship between Purdue and McKinsey.

120.    During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the CIA. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

121.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, '[w]e were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine' You had the impression they were portraying it as a bit of a witch hunt."[38] (Purdue and its executives paid $634.5 million in fines.)

122.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the CIA: Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with

---

[38] Crow, *supra* note 19.

a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier … We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[39]

## VII.   Project Turbocharge

123.    In 2013, the year after the CIA expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

124.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board of directors to adopt it. Specifically, McKinsey urged the board of directors to "make[] a clear go-no go decision to 'Turbocharge the Sales Engine.'"

125.    McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

126.    The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler to say "the discoveries of McKinsey are astonishing."

---

[39] *Id.* (alternation in original).

127.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family—not the Purdue board of directors—in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

128.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

129.    As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and rebranded the initiative as "E2E: Evolve to Excellence."[40]

130.    Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

131.    CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

---

[40] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive `turbocharge` process — ***though we do need to find a better and more permanently appropriate name.***" (emphasis added).

132.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

133.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

134.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

135.    McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a ***doubling*** of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:



136.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of *800%*.

137.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney ("Timney") received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, *i.e.*, those that prescribe the most OxyContin.[41]

138.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

139.    Purdue implemented McKinsey's suggestion.

## VIII.   McKinsey's Efforts Triple OxyContin Sales

140.    Purdue got what it wanted out of McKinsey. Between 2008 and 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

141.    These distributions would not have been possible without McKinsey's work dramatically increasing OxyContin sales. The Sacklers were aware of the value McKinsey

---

[41] In fact, recent deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

    Q:    Are you familiar with McKinsey & Company?

    A:    I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.

    Q:    Did individuals at McKinsey *assist you in getting hired as the CEO* of Purdue?

    A:    I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding. (emphasis added).

provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Purdue Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." These results were already being realized *before* the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

142.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a CIA whereby Purdue was monitored to assure that those sales did not continue.

143.    In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[42]

144.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a *tripling* of revenue from OxyContin sales.[43]

145.    Under McKinsey's guidance, OxyContin would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[44] That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010.[45] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

---

[42] Crow, *supra* note 19.

[43] *Id.*

[44] Phil McCausland & Tracy Connor, *OxyContin Maker Purdue to Stop Promoting Opioids in Light of Epidemic*, NBC News (updated Feb. 10, 2018, 4:53 PM), https://www.nbcnews.com/storyline/americas-heroinepidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726 (last accessed Mar. 30, 2021).

[45] Phil McCausland & Tracy Connor, *OxyContin Maker Purdue to Stop Promoting Opioids in Light of Epidemic*, NBC News (updated Feb. 10, 2018, 4:53 PM), https://www.nbcnews.com/storyline/americas-

146.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people—the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

147.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

## IX.    McKinsey Acted to Maximize OxyContin Prescriptions Despite Knowing About the Dangers of Opioids

148.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson ("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[46]

149.    Pearson stated, "[a]t McKinsey pharmaceuticals was one of our biggest industry groups."[47] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was

---

heroinepidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726 (last accessed Mar. 30, 2021).

[46] John Gapper, *McKinsey's Fingerprints Are All Over Valeant*, Fin. Times (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a (last accessed Mar. 30, 2021). Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to join Pearson at Valeant Pharmaceuticals in 2015 as Chief Financial Officer.

[47] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Inv. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry#:~:text=cookies%20click%20proceed.-Mike%20Pearson's%20New%20Prescription%20for%20the%20Pharmaceuticals%20Industry,on%20acq uisitons %20than%20on%20R%26D (last accessed Mar. 30, 2021).

loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[48]

150.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

151.    In 2012, while advising Purdue, McKinsey described its health care capabilities as follows: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

152.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, although the full scale of the opioid epidemic was not yet clear, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

153.    In February 2009, Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled "*The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*," stated the matter plainly: "***Compared with noncontrolled***

---

[48] Gapper, *supra* note 45.

***drugs, controlled drugs, with their potential for abuse and diversion, pose different public health***

***risks when they are overpromoted and highly prescribed.***[49] By 2004, OxyContin had become the

most prevalent prescription opioid abused in the United States.[50]

154.    Further, Dr. Van Zee identified the ***precise tactics*** that McKinsey deployed for

Purdue as a source of OxyContin misuse and abuse and suggested that regulation may be

appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid

prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel

increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in

some cases, the least discriminate."[51]

155.    Indeed, one reason that ***Purdue*** had knowledge that their own products were

addictive and dangerous is because McKinsey told them. On September 13, 2013 McKinsey

briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among

prescribers:

---

[49] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 Am. J. Pub. Health 221, at pp. 221, 225 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf (last accessed Mar. 30, 2021) (emphasis added).

[50] *Id.* at 224.

[51] *Id.* at 225.



156.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

157.    Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

158.    McKinsey's work further demonstrates its knowledge of the severity of the opioid crisis. In June 2009, McKinsey's work included "countering the emotional messages from mothers with teenagers that overdosed on OxyContin." Indeed, McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the ***overprescribing of opioids*** and the inevitable consequences thereof.

159.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

160.    Marvin Bower ("Bower"), a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[52]

161.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room—that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States—and delivered that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

162.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

163.    A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition … They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."[53]

---

[52] McDonald, *supra* note 22 at p. 35.

[53] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContinOverdoses*, N.Y. Times (updated Dec. 17, 2020),

164.    By 2018, McKinsey's senior executives were becoming aware that they could face liability for their opioid work. After the Commonwealth of Massachusetts filed suit against Purdue, Elling wrote to Ghatak: "'It probably makes sense to have a quick conversation with the risk committee to see if we should be doing anything' other than 'eliminating all our documents and emails. Suspect not but as things get tougher there someone might turn to us.'"[54]

165.    Both Elling and Ghatak were put on administrative leave and then subsequently fired following the results of an outside investigation into whether any material had been destroyed.[55]

## X.    Purdue's 2020 Guilty Plea, McKinsey's Apology and Settlement Agreements

166.    On October 20, 2020, Purdue once again agreed with the United States Department of Justice to plead guilty to improper marketing of OxyContin and other opioids. This time the plea agreement concerned conduct from 2010 to 2018, the period during which McKinsey was working closely with Purdue to implement McKinsey's strategy.

167.    Purdue agreed to plead guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[56]

---

https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html?name=styln-opioid&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Article&impressio n_id=b 745da80-69ce-11eb-ba7f-1321124f4232&variant=1_Show (last accessed Mar. 30, 2021).

[54] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Settles for Nearly $600 Million Over Role in Opioid Crisis* (Feb. 3, 2021), https://www.nytimes.com/2021/02/03/business/mckinsey-opioids-settlement.html (last accessed Mar. 30, 2021).

[55] *Id.*

[56] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html (last accessed Mar. 30, 2021).

168.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

169.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

170.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

171.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

172.    On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

> As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.[57]

173.    In February 2021, McKinsey reached a $573 million settlement with attorneys general in 47 states, the District of Columbia and five territories. McKinsey also settled with Washington for $13 million and West Virginia for $10 million.[58] In March 2021, McKinsey settled with Nevada for $45 million.[59]

## XI.    McKinsey's Work With Other Opioid Manufacturers

174.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs.

175.    On March 14, 2002 McKinsey prepared a confidential report for J&J regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to J&J was that they concentrate their sales and marketing efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[60]

176.    McKinsey's work with J&J, and its subsidiary Janssen Pharmaceuticals, Inc. ("Janssen"), on Duragesic continued for more than a decade.

---

[57] *McKinsey statement on its past work with Purdue Pharma*, McKinsey & Co. (Dec. 5, 2020), https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-purdue-pharma# (last accessed Mar. 30, 2021).

[58] *See* Michael Forsythe, supra note 54.

[59] *See* Jonathan Stempel, *McKinsey settles with holdout Nevada for $45 million over role in opioid crisis* (Mar. 22, 2021, 3:43 PM), https://www.reuters.com/article/us-usa-mckinsey-nevada/mckinsey-settles-with-holdout-nevada-for-45-million-over-role-in-opioid-crisis-idUSKBN2BE2XH.

[60] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, The Guardian (June 23, 2019), available at https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial (last accessed Mar. 30, 2021).

177.    J&J was evidently satisfied with that work, as McKinsey also advised J&J and Janssen on boosting sales of its' Nucynta opioid in 2011. McKinsey proposed that J&J and Janssen differentiate Nucynta from OxyContin on the basis of prescribers' concerns about OxyContin's abuse liability.

178.    McKinsey helped J&J and Janssen target its opioid marketing by identifying "priority growth opportunities" and growth strategies for Duragesic.

179.    In 2019, an Oklahoma state court found that McKinsey client J&J helped cause the opioid epidemic in Oklahoma, ordering it to pay $465 million to help abate the crisis.

180.    During the Oklahoma trial, evidence revealed that McKinsey asked J&J "[a]re we properly targeting and influencing prescription behavior in pain clinics?" McKinsey recommended "targeting and influencing" doctors who specifically treat back pain in the elderly and in long-term care. McKinsey further advised J&J to move physicians who were "stuck" in prescribing less potent opioids into prescribing stronger formulations."[61]

181.    McKinsey also designed and implemented for Mallinckrodt and Endo, marketing plans similar to those it created for Purdue.[62]

## XII.    McKinsey Benefitted From Increased Opioid Sales

182.    McKinsey's business is fueled by obtaining success for their clients, including the Opioid Manufacturers. As the Opioid Manufacturers succeeded in increasing the sales of opioids, McKinsey saw its revenue and profits increase.

---

[61] Walt Bogdanich, *McKinsey Advised Johnson & Johnson on Increasing Opioid Sales* (July 25, 2019), https://www.nytimes.com/2019/07/25/business/mckinsey-johnson-and-johnson-opioids.html (last visited Mar. 30, 2021).

[62] Pursuant to the Consent Judgement between McKinsey and the Commonwealth of Massachusetts, McKinsey must produce to all communications with Purdue, Endo, J&J, and Mallinckrodt related to opioids. Consent Judgment, available for download at https://www.mass.gov/doc/massachusetts-mckinsey-consent-judgment/download (last visited Mar. 30, 2021).

183.    As discussed above, McKinsey's strategy is to create long-term relationships with its clients. McKinsey's success in increasing opioid prescriptions has helped create long lasting, and profitable, relationships with the Opioid Manufacturers.[63]

184.    At the same time McKinsey was working for the Opioid Manufacturers, McKinsey also consulted with governments and non-profits working to abate the opioid crisis – a crisis that they helped to create, resulting in further profits McKinsey derived from the opioid crisis.

185.    McKinsey designed and implemented strategies for the Opioid Manufacturers that incentivized the Opioid Manufacturers to increase sales of not just their own opioid products, but also those of their competitors. McKinsey was able to use its intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts to boost OxyContin, specifically, to obtain and advise other opioid manufacturer clients. For example, McKinsey was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by following in the footsteps of Purdue.

186.    McKinsey has further benefitted financially through the increase in opioid prescriptions and the development of the opioid crisis by way of its wholly owned hedge fund affiliate, MIO Partners ("MIO"). MIO stands for McKinsey Investment Office, and only money from McKinsey employees, partners, former, partners and family is allowed into the fund.[64]

187.    MIO oversees its investments with a staff and 14-person board, which consists of 8 current or former McKinsey executives or directors.[65] MIO's investment managers are selected

---

[63] Bogdanich, *supra* note 61. When asked during the Oklahoma trial whether J&J continues to use McKinsey, J&J's corporate representative testified: "Yes, for different projects."

[64] Celarier, *supra* note 37.

[65] Gretchen Morgenson, *Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts* (Feb. 8, 2021 4:02 AM), https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969 (last accessed Mar. 30, 2021).

by MIO's management to deploy its $14.6 billion.[66] The investment managers are paid by McKinsey.[67]

188.    During the years that McKinsey was advising the Opioid Manufacturers and the opioid crisis was developing, MIO invested in companies that benefited during the opioid crisis.[68]

189.    Since 2010, a retirement fund managed by MIO has held a $108 million stake in Deerfield Management Co., a health care investment firm.[69] Two of Deerfield's executives are former McKinsey employees.[70]

190.    During the time period MIO has invested in Deerfield, Deerfield has taken large stakes in opioid manufacturers, in distributors of the drugs and in addiction treatment facilities.[71] For example, in 2017, Deerfield was a 6 percent shareholder in Mallinckrodt, one of the opioid manufacturers that hired McKinsey to perform consulting work.[72]

191.    From 2011 to 2016, Deerfield held a stake – once valued at $90 million – in Teva Pharmaceuticals, another opioid manufacturer.[73] Deerfield also had stake in two pharmaceutical distribution companies, McKesson and Cardinal, that distribute opioids throughout the United States.[74]

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

192.    MIO also owns 26 percent of Adamis Pharmaceuticals' preferred shares, a company that develops products to treat opioid overdoses.[75]

193.    McKinsey will likely even benefit from the recent settlements with the state attorneys general. Most of the settlement funds will be used to create state programs funding addiction treatment centers and recovery services.[76] Deerfield has invested $331 million in Recovery Centers of America, an addiction treatment company with facilities in Massachusetts, New Jersey, and Pennsylvania.[77]

## XIII.   Impact of McKinsey and the Opioid Manufacturers' Conduct

194.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[78]

195.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue. The study noted "[p]hysician

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA Network 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914 (last accessed Mar. 30, 2021).

prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[79]

196.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[80]

197.    Plaintiff's Assignor and the putative Class Members, as third-party payers, have been forced to incur substantial costs they otherwise would not have incurred but for McKinsey's conduct. Plaintiff's Assignors and the putative Class Members have paid for fraudulently-induced opioid prescriptions and treatments for enrollees who became addicted or dependent on opioids that were obtained through McKinsey's pattern of racketeering and fraudulent activity. Plaintiff's Assignor has paid over $2 million for OxyContin prescriptions alone.

## FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RICO ACT

### I.    The Opioid Marketing Enterprise

198.    McKinsey and the co-conspirators conducted and actively participated in conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Additionally, and in the alternative, McKinsey and the co-conspirators, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of McKinsey and the co-conspirators (otherwise known as the "Opioid Marketing Enterprise Members") were in furtherance of the enterprise and in violation of 18 U.S.C. § 1962(d).

---

[79] *Id.* at p. 2.

[80] *Id.* at p. 1 (emphasis added).

199.    The Opioid Marketing Enterprise Members include McKinsey, Purdue, Rhodes, J&J, Janssen, Endo, and Mallinckrodt. The Enterprise is an association-in-fact between the Opioid Marketing Enterprise Members. The Enterprise is distinct from, albeit primarily conducted by, McKinsey, through the aforementioned co-conspirators/ Opioid Marketing Enterprise Members, and had an ongoing existence.

200.    The purpose of the Enterprise was to unlawfully increase sales of opioids—and grow the overall prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

201.    McKinsey as the leader of the Enterprise, created and implemented opioid marketing plans for each of the Opioid Marketing Enterprise Members, that were designed to, and did in fact, increase sales in the opioid prescription market. As addressed in detail above, the strategy of increasing overall opioid sales directly benefitted each Opioid Marketing Enterprise Member, including McKinsey.

202.    In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioid epidemic.

203.    As alleged in detail above, the Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff's and the Class, and made misleading statements

and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included that: (1) addiction is rare among patients taking opioids for pain; (2) addiction risk can be effectively managed; (3) symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) withdrawal is easily managed; (5) increased dosing presents no significant risks; (6) long-term use of opioids improves function; (7) the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) use of time-released dosing prevents addiction; and (9) abuse-deterrent formulations provide a solution to opioid abuse.

204.    The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased opioid sales – and the overall size of the opioid market – through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

205.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

206.    As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge Purdue or other

manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

207.    The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic.

208.    The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, opioids continue to be prescribed and used for chronic pain throughout the United States, including in the Commonwealth of Massachusetts, and the epidemic continues to injure Plaintiff's Assignor and the Class and consume the resources of Plaintiff's Assignor and the Class.

209.    As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

## II.        The Conduct of the Opioid Marketing Enterprise Violated Civil RICO

210.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.      Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and third-party payers;

b.      Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and third-party payers;

c.      Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and third-party payers;

d.      Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints;

e.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f.      Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

211.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase sales of opioid prescriptions – and the overall size of the opioid market, which ultimately benefited all Members of the Enterprise, including McKinsey. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

III.    **Pattern of Racketeering Activity**

212.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

213.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, Plaintiff's Assignor, and the Class Members relied on the Opioid Marketing Enterprise Members' misrepresentations.

214.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiff's Assignor, the Class, and other intended victims.

215.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

216.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

217.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

    a.    Marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the United States, including in the Commonwealth of Massachusetts. For example, marketing materials promoting the notion that opioids can provide "freedom" and "peace of mind" to its users, or that opioids are "hope in a bottle;"

    b.    Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and front

groups regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

      c.     Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic, long-term pain generally;

      d.     E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and front groups agreeing to or implementing the opioids marketing scheme;

      e.     E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

      f.     Communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members, front groups, and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

      g.     Written and oral communications directed to the public throughout the country, including to Plaintiff's Assignor and the Class, that fraudulently misrepresented the risks and benefits of using opioids for chronic pain;

      h.     Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme; and

      i.     Financial payments between the Opioid Marketing Enterprise Members.

218.   In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications throughout the U.S. Mail and interstate wire facilities that claimed the benefits of using opioids for chronic pain outweighed the risks of doing so.

219.   To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators, Plaintiff's Assignor, and the Class: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups, and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

220.   The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

221.   Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and front groups, and often collaborated on and mutually supported the same publications, Continuing Medical Education programs (CMEs), presentations, and prescription guidelines.

222.   The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's Assignor and the Class, while

simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## TOLLING OF STATUTES OF LIMITATIONS

223.    At all times relevant to this Complaint, McKinsey and Purdue took active steps to conceal their unlawful activities, including through the conspiracy alleged herein. For example, and without limitation, McKinsey and Purdue concealed their efforts to (i) circumvent the restrictions of the CIA in order to increase the sale of opioids; and (ii) further boost the sale of opioids after the expiration of the CIA, including through "Project Turbocharge" and "Evolve to Excellence." McKinsey, Purdue, and the other Opioid Manufacturers further undertook active efforts to deceive Plaintiff's Assignor, the Class, and the general public, thus concealing their unlawful conduct, including by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain, creating and implementing a deceptive opioid marketing strategy, omitting or concealing material facts, and failing to correct prior misrepresentations and omissions about the purported benefits and risks of opioids.

224.    **Discovery Rule:** McKinsey's consulting services were given confidentially, and the content of those services was not public. Plaintiff's Assignor could not have knowledge of the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this Complaint.[81]

---

[81] *See* Bogdanich & Forsythe, *supra* note 52.

225.    Information in the public domain was insufficient to place Plaintiff's Assignor and the Class on inquiry notice of McKinsey's unlawful, unfair, and deceptive activities prior to 2020. For these reasons, any statutes of limitations applicable to the claims of Plaintiff's Assignor and the Class did not begin to run and have been tolled until 2020.

226.    **Fraudulent Concealment:** The statutes of limitation were further tolled by the doctrine of fraudulent concealment. McKinsey, Purdue, and the other Opioid Manufacturers actively concealed the existence of their unlawful scheme, including through false or misleading representations. Despite the requirements of the CIA, which restrained Purdue from making any deceptive or misleading claims about OxyContin, McKinsey devised a strategy and worked with Purdue to implement the strategy to maximize the sale of opioids, including through deceptive and misleading claims regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions, but devised and implemented a strategy to spread these deceptive and misleading claims to health care providers, consumers, Plaintiff's Assignor, the Class, and the public in order to boost sales of opioids, including Oxycontin, despite the public impression that Purdue had corrected its conduct as a result of the CIA.

227.    McKinsey and the Opioid Manufacturers were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic

228.    McKinsey's fraudulent concealment prevented Plaintiff's Assignor and the Class from discovering the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding

McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this Complaint.

229.    **Continuing Tort:** McKinsey is estopped from relying on any statute of limitations defense because its illegal, deceptive, and fraudulent practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Plaintiff's Assignor and the Class.

## CLASS REPRESENTATION ALLEGATIONS

**I.    Class Definition**

230.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class action on its own behalf and on behalf of all Class Members nationwide. Plaintiff seeks class certification of the claims alleged in this action and judgment for damages against McKinsey for itself and on behalf of the Class.

231.    The Class is defined as follows, and consists of:

> All third-party payers in the United States and its territories who that sustained Costs, as defined herein, related to the prescription and/or consumption by their enrollees of opioids. Such Costs include the purchase or reimbursement of some or all of the purchase price of said opioids, as well as the monies paid or reimbursed for addiction, dependence, or overdose treatment related to such opioid use by the third-party payers' enrollees (the "Class").

> The Class includes any entities that possess the rights to recovery and/or reimbursement of the above-referenced Costs from the above referenced third-party payers.

> Excluded from the Class are: McKinsey; any parent, subsidiary, or affiliate of McKinsey; any entity in which McKinsey has or had a controlling interest, or which McKinsey otherwise controls or controlled; any officer, directors, employee, legal representative, predecessor, successor, or assign of McKinsey.

232.     In the alternative, Plaintiffs allege sub-classes for all third-party payers in each State, territory, or possession—or combination(s) of States, territories, or possessions to the extent these Jurisdictions' applicable laws are substantially similar and can be grouped together for purposes of class treatment—who paid any amount of money for improperly prescribed and/or administered opioid drugs and expenses associated with the treatment opioid addiction.

## II.     Requirements of Federal Rule of Civil Procedure 23(a)

233.     Federal Rule of Civil Procedure 23(a) provides for class certification where the representative plaintiff demonstrates that:

1.  The class is so numerous that joinder of all members is impracticable;

2.  There are questions of law or fact common to the class;

3.  The claims or defense of the representative parties are typical of the claims or defenses of the class; and

4.  The representative parties will fairly and adequately protect the interests of the class.

### A.     Numerosity

234.     On information and belief, the Class includes hundreds of third-party payers, throughout the United States, including the Commonwealth of Massachusetts, such that individual joinder of each Class Member is impracticable.

### B.     Commonality

235.     Plaintiff and the Class Members assert claims that raise common questions of law and fact.

236.     Some of the common questions of law and fact include:

a.     Whether McKinsey participated in the conduct alleged herein;

b.     Whether McKinsey engaged in a pattern of deceptive, fraudulent and/or improper activity;

c. Whether McKinsey and the Co-Conspirators constitute an enterprise within the meaning of 18 U.S.C. § 1961(4);

d. Whether McKinsey and the Co-Conspirators formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent schemes;

e. Whether the Opioid Marketing Enterprise used the U.S. mails and interstate wire facilities to carry out its fraudulent scheme;

f. Whether the Opioid Marketing Enterprise engaged in a pattern of racketeering activity;

g. Whether McKinsey used or invested income from their racketeering activities to establish an enterprise in violation of 18 U.S.C. § 1962(a);

h. Whether McKinsey conducted or participated in the affairs of an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c);

i. Whether McKinsey's conduct, in whole or in part, has substantially affected interstate and intrastate commerce;

j. Whether McKinsey engaged in conduct that violated the federal racketeering laws as alleged herein;

k. Whether McKinsey's conduct was unfair or deceptive, in violation of the state consumer protection laws alleged herein;

l. Whether McKinsey has been unjustly enriched; and

m. Whether Plaintiff's Assignor and the Class Members were injured by McKinsey's conduct and, if so, the appropriate class-wide measure of damages.

237. The common questions identified above predominate over questions, if any, that may affect only individual Class Members.

238. McKinsey subjected Plaintiff's Assignor and the Class Members to the same harm and did so in the same manner.

**C.    Typicality**

239. Plaintiff's claims are typical of the claims of the Class Members because they are based on the same legal theory, arise from the similarity, uniformity, and common purpose of

McKinsey's unlawful conduct, and are not subject to any unique defenses. As a result of McKinsey's wrongful conduct, the Class Members sustained damages in the same manner as Plaintiff.

240.    Plaintiff's claims are typical of the Class Members, in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiff's Assignor and McKinsey's conduct affecting Class Members, and Plaintiff has no interests adverse to the interests of the other Class Members.

### D.    Adequacy of Representation

241.    Plaintiff and its attorneys will fairly and adequately protect and represent the interests of the Class. Plaintiff is a member of the Class defined above, is committed to the active and vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature.

242.    There is no hostility of interests between Plaintiff and the Class and there will be no difficulty in the management of this litigation as a class action.

## III.    Requirements of Federal Rule of Civil Procedure 23(b)

243.    Questions of fact or law common to Plaintiff's and the Class Members' claims predominate over any questions of law or fact affecting only individual Class Members. All claims by Plaintiff and Class Members arise from the McKinsey's common course of unlawful conduct. The predominating questions of law and fact include those set forth above in Paragraph 236.

244.    Common issues predominate where, as here, liability can be determined on a class-wide basis, even if there might be the need for some individualized damages determinations. As a result, in determining whether common questions predominate, courts focus on the liability issue,

and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

245.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation because a class action is the most manageable and efficient way to resolve the individual claims of each Class Member.

246.   Specifically, a class action is the superior method of adjudicating Plaintiff's and the Class Members' claims because it will provide Class Members with what may be their only economically viable remedy. Moreover, there are no known Class Members who are interested in individually controlling the prosecution of separate actions. In addition, a class action will concentrate all litigation in one forum, which will conserve judicial and party resources with no unusual manageability problems, because issues regarding McKinsey's liability and the nature of Class Members' damages will be determined by class-wide proof, while the amounts of Class Members' damages will be determined by class-wide methods of data processing and computation.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

247.   Plaintiff incorporates by reference paragraphs 1 through 246 as if fully set forth herein.

248.   Plaintiff brings this Count on behalf of itself and the Class.

249.   At all relevant times, McKinsey is and has been a "person," pursuant to 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

250.   Plaintiff's Assignor and the members of the Class are "persons," pursuant to 18 U.S.C. § 1961(3), who were injured in its business or property as a result of McKinsey's wrongful

conduct.

251.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of McKinsey and the Opioid Marketing Enterprise Members. All entities are persons within the meaning of 18 U.S.C. § 1961(3) and acted to enable McKinsey to carry-out the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits the sales of opioid prescriptions. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.

252.    The enterprise functioned as an ongoing organization and continuing unit. The enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Opioid Marketing Enterprise Members, including McKinsey, is a "person" distinct from the enterprise.

253.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

254.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and

(iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

255.    Further, each of the Opioid Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

256.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

257.    The enterprise engaged in and affected interstate commerce, because, *inter alia*, it

marketed, promoted, sold, or provided opioids prescriptions throughout the United States.

258.    McKinsey exerted control over the enterprise and has participated in the operation and management of the affairs of the enterprise in coordination with the various Opioid Marketing Enterprise members.

259.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). McKinsey's scheme consisted of, *inter alia*, making misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included that: (1) addiction is rare among patients taking opioids for pain; (2) addiction risk can be effectively managed; (3) symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) withdrawal is easily managed; (5) increased dosing presents no significant risks; (6) long-term use of opioids improves function; (7) the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) use of time-released dosing prevents addiction; and (9) abuse-deterrent formulations provide a solution to opioid abuse.

260.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The conduct of the enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S. §1961(1). The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat

of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" within the meaning of 18 U.S. §1961(5). The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the Internet to transmit communications and payments in interstate or foreign commerce.

261.   The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

   a.   Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

   b.   Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

262.   As summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions, and payments to carry out the Opioid Marketing Enterprise's fraudulent scheme.

263.    Because the Opioid Marketing Enterprise Members disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiff has described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, Plaintiff's Assignor's, and the Class, and how those acts were in furtherance of the scheme.

264.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, Plaintiff's Assignor, and the Class. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

265.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein, and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise

266.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, Plaintiff's Assignor, and the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution and had the same results affecting the same victims, including consumers, prescribers, regulators, Plaintiff, and the Class. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

267.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

268.    As described herein, the Opioid Marketing Enterprise Members engaged in pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of the highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

269.    McKinsey's motive in creating and operating the Opioid Marketing Enterprise was to obtain additional revenues from the marketing and sale of opioid prescriptions. This scheme was designed to, and did, cause Plaintiff's Assignor and the putative Class Members to pay for opioid prescriptions and/or addiction treatment, without being fully informed about the true risks of opioids.

270.    The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff's Assignor and the Class injury in their business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. The injuries of Plaintiff's Assignor and the Class, as described herein, were not unexpected, unforeseen, or independent. Rather, as Plaintiff alleges, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

271.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern or racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

272.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff's Assignor and the Class. As a result of McKinsey's conduct, and in particular, its pattern of racketeering activity, Plaintiff's Assignor and the Class Members have been injured in their business and/or property in multiple ways, including but not limited to paying for opioid prescriptions and expenses relating to the treatment of opioid addiction for their Enrollees.

273.    By virtue of these violations of 18 U.S.C. § 1962(c), McKinsey is liable to Plaintiff and the Class Members for three times the damages sustained, plus the costs of this suit, including

reasonable attorney's fees.

274.    By reason of the foregoing, and as a direct and proximate result of McKinsey's fraudulent misrepresentations, Plaintiff's Assignor and the Class Members suffered damages. Plaintiff and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees.

## COUNT II
## CONSPIRACY TO VIOLATE RICO
## PROVISIONS VIOLATION OF 18 U.S.C. § 1962(d)

275.    Plaintiff incorporates by reference paragraphs 1 through 274 as if fully set forth herein.

276.    Plaintiff brings this Count on behalf of itself and the Class.

277.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

278.    McKinsey and the Opioid Marketing Enterprise Members violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Opioid Marketing Enterprise described previously through a pattern of racketeering activity. McKinsey conspired with the Opioid Marketing Enterprise Members, *inter alia*, McKinsey directors and executives, sales representatives, KOL physicians receiving kickbacks for prescribing opioid drugs and for recruiting other physicians to prescribe opioid drugs, un-named co-conspirator physicians, un-named co-conspirator pharmacies, and other as of yet unknown entities that participated in the conspiracy, such as information technology contractors who set up systems masking numbers used to contact third-party payers to promote and obtain payment for opioid drugs for off-label prescription use.

279.    McKinsey and the Opioid Marketing Enterprise Members, engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff's Assignors and the Class of money.

280.    The nature of McKinsey and the Opioid Marketing Enterprise Members' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

281.    As a direct and proximate result of McKinsey's and the Opioid Marketing Enterprise Members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff's Assignor and the members of the Class have been and are continuing to be injured in their business or property as set forth more fully above.

282.    McKinsey and the Opioid Marketing Enterprise Members sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts discussed extensively herein, including but not limited to:

        a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

        b.   Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

        c.   Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

        d.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

283.    By virtue of these violations of 18 U.S.C. § 1962(d), McKinsey is liable to Plaintiff and the Class for three times the damages Plaintiff's Assignor and the Class Members have

sustained, plus the cost of this suit, including reasonable attorney's fees.

284. By reason of the foregoing, and as a direct and proximate result of McKinsey's fraudulent scheme, Plaintiff's Assignor and the Class have suffered damages. Plaintiff and the Class are entitled to compensatory damages, punitive damages, costs and reasonable attorneys' fees.

**COUNT III**
**VIOLATION OF STATE CONSUMER PROTECTION STATUES**

285. Plaintiff incorporates by reference paragraphs 1 through 284 as if fully set forth herein.

286. Plaintiff brings this Count on behalf of itself and the Class.

**<u>Florida Deceptive and Unfair Trade Practices Act</u>**
**Fla. Stat. §§ 501.201,** *et seq.*

287. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce ..." Fla. Stat. § 501.204(1).

288. As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of FDUTPA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

289. McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

290. McKinsey owed and continues to owe Plaintiff's Assignor and Class Members a duty to refrain from the above-described unfair and deceptive practices.

291. McKinsey knew or should have known that its conduct was in violation of

FDUTPA.

292.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated FDUTPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by FDUTPA.

293.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

294.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

295.    But for these unfair methods of competition, unconscionable acts, and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

296.    Plaintiff, on behalf of itself and the Class Members, is entitled to recover actual

damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

297.    Plaintiff, on behalf of itself and the Class Members, also seeks any other just and proper relief available under the FDUTPA.

### Massachusetts Regulation of Business Practice & Consumer Protection Act
### Mass. Gen. Laws Ann. ch. 93A, §§ 1, *et seq.*

298.    The Massachusetts Regulation of Business Practice and Consumer Protection Act ("Massachusetts CPA") makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. ch. 93A, § 2(a).

299.    As detailed above, in the course of their business, McKinsey engaged in unfair or deceptive acts or practices in violation of the above-noted provisions of the Massachusetts CPA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

300.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the Commonwealth of Massachusetts.

301.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

302.    McKinsey knew or should have known that its conduct was in violation of the Massachusetts CPA.

303.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated Massachusetts CPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers,

of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Massachusetts CPA.

304.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

305.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

306.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

307.    Because McKinsey's unfair and deceptive practices caused actual harm to Plaintiff's Assignor and the Class Members, Plaintiff, on behalf of itself and the Class Members seeks recovery of actual damages, discretionary double or treble damages, reasonable attorneys' fees and costs, and all other proper and just relief available under the Massachusetts CPA.

## Michigan Consumer Protection Act
### Mich. Comp. Laws §§ 445.902, *et seq.*

308.    Under the Michigan Consumer Protection Act ("Michigan CPA"), "failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer" is an unfair, unconscionable, or deceptive

tmp

method act or practice. Mich. Comp. Laws § 445.903(s).

309.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Michigan CPA by failing to disclose material facts regarding the purported benefits and risks of opioids.

310.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Michigan.

311.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

312.    McKinsey knew or should have known that its conduct was in violation of the Michigan CPA.

313.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the Michigan CPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Michigan CPA.

314.    Plaintiff's Assignor and the Class Members relied on McKinsey's misrepresentations regarding the benefits and risks of opioids.

315.    McKinsey's unfair and deceptive acts or practices, omissions and

misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

316.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

317.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

318.    Plaintiff, on behalf of itself and the Class Members, seeks monetary relief against McKinsey measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 Plaintiff and each Class Member, plus reasonable attorneys' fees and any other just and proper relief available under Mich. Comp. Laws § 445.911.

319.    Plaintiff, on behalf of itself and the Class Members, also seeks punitive damages because McKinsey carried out despicable conduct with willful and conscious disregard of the rights and safety of others. McKinsey maliciously and egregiously mislead the public, including Plaintiff's Assignor and the Class Members, regarding the purported benefits and risks of opioids McKinsey's conduct constitutes malice, oppression, and fraud, warranting punitive damages.

## Minnesota Private Attorney General Statute & Consumer Fraud Act
### Minn. Stat. §§ 8.31, *et seq.* & § 325F.69

320.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

321.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Minnesota CFA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

322.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Minnesota.

323.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

324.    McKinsey knew or should have known that its conduct was in violation of the Minnesota CFA.

325.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the Minnesota CFA by making false and misleading representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Minnesota CFA.

326.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely

to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

327.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

328.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

329.    Pursuant to Minn. Stat. § 8.31(3)(a), Plaintiff, on behalf of itself and the Class Members, seeks actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota Private Attorney General Statute.

330.    Plaintiff, on behalf of itself and the Class Members, also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that McKinsey's acts show deliberate disregard for the rights or safety of others.

## Nebraska Consumer Protection Act
### Neb. Rev. Stat. §§ 59-1601, *et seq.*

331.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

332.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Nebraska CPA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

333.    McKinsey's conduct alleged in this Complaint occurred throughout the United

States, including in the State of Nebraska.

334. McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

335. McKinsey knew or should have known that its conduct was in violation of the Nebraska CPA.

336. McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated Nebraska CPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Nebraska CPA.

337. McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

338. Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

339. But for these unfair methods of competition and unfair and/or deceptive acts or

practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

340.    Because McKinsey's conduct caused injury to Plaintiff's Assignor and the Class Members' property through violations of the Nebraska CPA, Plaintiff, on behalf of itself and the Class Members, seeks recovery of actual damages, as well as enhanced damages up to $1,000, court costs, attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

### Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. §§ 598.0903, *et seq.*

341.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices, including unfair trade practices actionable at common law. Nev. Rev. Stat. § 598.0903(2).

342.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Nevada DTPA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

343.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Nevada.

344.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

345.    McKinsey knew or should have known that its conduct was in violation of the Nevada DTPA.

346.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid

Manufacturers' marketing strategy, violated the Nevada DTPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Nevada DTPA.

347.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

348.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

349.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

350.    Plaintiff, on behalf of itself and the Class Members, seeks actual damages, punitive damages, court costs, attorneys' fees, and all other appropriate and available remedies under Nevada law.

### New Mexico Unfair Trade Practices Act
### N.M. Stat. Ann. §§ 57-12-1, *et seq.*

351.    The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes

unlawful "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D)(14).

352.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the New Mexico UTPA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

353.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of New Mexico.

354.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

355.    McKinsey knew or should have known that its conduct was in violation of the New Mexico UTPA.

356.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the New Mexico UTPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the New Mexico UTPA.

357.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely

to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

358.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

359.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

360.    Because McKinsey's unconscionable, willful conduct caused actual harm to Plaintiff's Assignor and the Class Members, Plaintiff, on behalf of itself and the Class Members, seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under the New Mexico UTPA.

### North Dakota Consumer Fraud Act
### N.D. Cent. Code §§ 51-15-02, *et seq.*

361.    The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice." N.D. Cent. Code § 51-15-02.

362.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the North Dakota CFA by misleading the public, including Plaintiff's Assignors and the Class,

regarding the purported benefits and risks of opioids.

363.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of North Dakota.

364.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

365.    McKinsey knew or should have known that its conduct was in violation of the North Dakota CFA.

366.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the North Dakota CFA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the North Dakota CFA.

367.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

368.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other

opioid-related health costs.

369.     But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

370.     As a result of McKinsey's conduct, under the North Dakota CFA, McKinsey is liable to Plaintiff and the Class Members for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements, and any other just and proper available relief under the North Dakota CFA.

**Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 Pa. Cons. Stat. §§ 201-1, *et seq.***

371.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL") prohibits "unfair or deceptive acts or practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

372.     As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Pennsylvania UTPCPL by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

373.     McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Pennsylvania.

374.     McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

375.     McKinsey knew or should have known that its conduct was in violation of the Pennsylvania UTPCPL.

376.     McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the Pennsylvania UTPCPL by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Pennsylvania UTPCPL.

377.     Plaintiff's Assignor and the Class Members relied on McKinsey's misrepresentations regarding the benefits and risks of opioids.

378.     McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

379.     Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

380.     But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

381.     McKinsey is liable to Plaintiff and the Class Members for treble damages or $100,

whichever is greater, attorneys' fees, and court costs. Plaintiff and the Class Members are entitled to an award of punitive damages because McKinsey's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### South Dakota Deceptive Trade Practices and Consumer Protection Law
### S.D. Codified Laws §§ 37-24-1, *et seq.*

382.    The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota DTPCPL") broadly prohibits, among other things, knowingly acting, using, or employing any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby. S.D. Codified Laws § 37-24-6.

383.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the South Dakota DTPCPL by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

384.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of South Dakota.

385.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

386.    McKinsey knew or should have known that its conduct was in violation of the South Dakota DTPCPL.

387.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the South Dakota DTPCPL by making unfair and/or

deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the South Dakota DTPCPL.

388.    Plaintiff's Assignor and the Class Members relied on McKinsey's misrepresentations regarding the benefits and risks of opioids.

389.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor and the Class Members.

390.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

391.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

392.    McKinsey is liable to Plaintiff and the Class Members for actual damages and any other just and proper available relief under the South Dakota DTPCPL.

### Vermont Consumer Fraud Act
### Vt. Stat. Ann. tit 9, §§ 2451, *et seq*.

393.    The Vermont Consumer Fraud Act ("Vermont CFA") broadly prohibits unfair

methods of competition and unfair and deceptive acts or practices. Vt. Stat. Ann. tit 9, § 2453.

394.    As detailed above, in the course of their business, McKinsey engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of the Vermont CFA by misleading the public, including Plaintiff's Assignors and the Class, regarding the purported benefits and risks of opioids.

395.    McKinsey's conduct alleged in this Complaint occurred throughout the United States, including in the State of Vermont.

396.    McKinsey owed and continues to owe Plaintiff's Assignors and Class Members a duty to refrain from the above-described unfair and deceptive practices.

397.    McKinsey knew or should have known that its conduct was in violation of the Vermont CFA.

398.    McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, violated the Vermont CFA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain. McKinsey, directly and/or through its creation and implementation, together with the Opioid Manufacturers, of the Opioid Manufacturers' marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constituted deceptive conduct prohibited by the Vermont CFA.

399.    McKinsey's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiff's Assignor and the Class Members and were likely to and did, in fact, deceive regulators and reasonable consumers, including the Plaintiff's Assignor

and the Class Members.

400.    Plaintiff's Assignor and the Class Members have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff's Assignor and the Class Members have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs.

401.    But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff's Assignor and the Class Members would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

402.    Because McKinsey's unfair and deceptive practices caused actual harm to Plaintiff's Assignor and the Class Members, Plaintiff, on behalf of itself and the Class Members seeks recovery of actual damages, treble damages, reasonable attorneys' fees and costs, and all other proper and just relief available under the Vermont CFA.

**COUNT IV**
**NEGLIGENCE**

403.    Plaintiff incorporates by reference paragraphs 1 through 402 as if fully set forth herein.

404.    Plaintiff brings this Count on behalf of itself and the Class.

405.    McKinsey, in its work with the Opioid Manufacturers, owed a duty of care to Plaintiff's Assignor and the Class Members, including but not limited to taking reasonable steps not to encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

406.    In violation of this duty, for years McKinsey devised, and assisted the Opioid Manufacturers with implementing sales and marketing campaigns that would dramatically increase the amount of opioids prescribed and distributed throughout the United States. In the

process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get health care providers to write more opioid prescriptions, which in turn caused third-party payers, such as Plaintiff's Assignor and the Class Members to pay for these opioid prescriptions and the resulting opioid addiction related treatment.

407.   As a direct and proximate result if McKinsey's negligent conduct, Plaintiff's Assignor and the Class Members, suffered and will continue to suffer harm, and are entitled to damages in an amount to be determined at trial.

## COUNT V
## NEGLIGENT MISREPRESENTATION

408.   Plaintiff incorporates by reference paragraphs 1 through 407 as if fully set forth herein.

409.   Plaintiff brings this Count on behalf of itself and the Class.

410.   McKinsey had a duty to exercise reasonable care in the distribution of opioids.

411.   McKinsey, in the course of its business with the Opioid Manufacturers, failed to exercise reasonable care or competence when obtaining and communicating false information regarding the Opioid Manufacturer's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including third-party payers, such as Plaintiff's Assignor and the Class Members, who pay for their enrollees' opioid prescriptions and opioid addiction treatment.

412.   Plaintiff's Assignor and the Class Members are among a limited group of entities to whom McKinsey knew the Opioid Manufacturers intended to supply the false information regarding opioids.

413.   McKinsey knew that the false information was material to the third-party payers' decisions to pay or reimburse for their enrollees' opioid prescriptions. McKinsey intended that

such statements be relied upon to encourage opioid prescriptions.

414.    As a direct and proximate result if McKinsey's negligent conduct, Plaintiff's Assignor and the Class Members, suffered and will continue to suffer harm, and are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class Members, respectfully requests the following relief:

a.    A finding that this action satisfies the prerequisites for maintenance of a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), and an order certifying the Class (and as appropriate, Subclasses);

b.    Designation of Plaintiff as representative for the Class and Plaintiff's counsel as Class Counsel; and

c.    Enter judgments against McKinsey and in favor of Plaintiff for violations of the federal and common laws and legal standards invoked in this Complaint;

d.    Order McKinsey to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.    Award Plaintiff the full measure of available damages in an amount to be determined at trial;

f.    Award Plaintiff exemplary, treble, and punitive damages sufficient to punish and deter McKinsey and others from future deceptive and unlawful marketing practices;

g.    Award Plaintiff its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, and the common fund doctrine;

h.    Award such further and additional relief as the case may require and the Court may

deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: March 31, 2021                    Respectfully submitted,


By: */s/ Adam Rivera*
Adam Rivera (BBO # 693885)
**MSP RECOVERY LAW FIRM**
2701 S. Le Jeune Rd, 10th Floor
Coral Gables, Florida 33134
Telephone: (305) 614-2222
arivera@msprecoverylawfirm.com
serve@msprecoverylawfirm.com
Robert Strongarone (to be admitted *pro hac vice*)
rstrongarone@msprecoverylawfirm.com

Christopher L. Coffin (to be admitted *pro hac vice*)
Tracy L. Turner (to be admitted *pro hac vice*)
Anna K. Higgins (to be admitted *pro hac vice*)
**PENDLEY, BAUDIN & COFFIN, LLP**
2225 Energy Center
1100 Poydras St.
New Orleans, LA 70163
Telephone: (504) 355-0086
ccoffin@pbclawfirm.com
tturner@pbclawfirm.com
ahiggins@pbclawfirm.com